IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

EDDIE WATKINS                                                                           PLAINTIFF

v.                                    Civil No. 02-6102

CHIEF RICHARD TAFT;
MAYOR NORTHCUTT;
LT. McANEAER; LT. ROSS; and
OFFICER BRANDON DAVIS                                                                   DEFENDANTS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Eddie Watkins, an inmate of the Federal Correctional Complex in Forrest City, Arkansas, brings this pro se civil rights action pursuant to 42 U.S.C. § 1983. Watkins contends his federal constitutional rights were violated while he was incarcerated at the Malvern City Jail. Specifically, he contends he was denied necessary medications and housed with an inmate who had a communicable disease.

On November 11, 2005, defendants filed a motion for summary judgment (Doc. 85). On December 7, 2005, the undersigned entered an order (Doc. 90) directing the plaintiff to complete, sign and return an attached questionnaire that would serve as his response to the motion for summary judgment. On January 3, 2006, plaintiff's response to the court's questionnaire (Doc. 92) was filed. The case is currently before the undersigned for the issuance of a report and recommendation on the summary judgment motion.

## I. BACKGROUND

Watkins was arrested on April 26, 1999, and booked into the Malvern City Jail (MCJ). *Plaintiff's Response* (Doc. 92) (hereinafter *Resp.*) at ¶ 1(A). He was charged with theft of property a class B felony and possession of an instrument of crime. *Id.* at ¶ 1(B). Watkins was incarcerated solely because of the pending criminal charges. *Id.* at ¶ 1(C). The charges were later nolle prossed. *Id.* Watkins remained at the MCJ until on or about May 9, 1999. *Resp.* at ¶ 1(D); *Defendants' Exhibit* (hereinafter *Defts' Ex.*) 2 at ¶ 14.

Richard Taft has been the Chief of Police of the Malvern Police Department since September 1, 1992. *Defts' Ex.* 1 at ¶ 3; *Resp.* at ¶ 29. Watkins never spoke directly to Taft regarding Watkins' need for medical care or his being housed with Steven Herron, an inmate who had tested positive for human immunodeficiency virus (HIV). *Id.* at ¶ 31. However, Watkins maintains former Officer Stanley Paxton spoke with Taft regarding these concerns on several occasions. *Id.* at ¶ 30.

The written facility rules state that necessary medical services will be provided when requested by inmates. *Defts' Ex.* 1, attached Ex. A, Section VII. The rules provide that if an inmate is ill or injured and it is deemed emergency medical care is needed, the inmate is to be transported to the Hot Spring County Memorial Hospital. *Id.*

According to defendants, inmates are given paperwork informing them they have the right to access to medical care. *Defts' Ex.* 1, attached exhibit A. The rules provide that the jailers have an affirmative duty to inquire every morning at approximately 8:00 a.m. whether any prisoners need medical or dental care. *Defts' Ex.* 1, attached Ex. A, Section VII. The jailers

are charged with dispensing medication prescribed by a doctor and logging all medication given to inmates. *Id.*

The rules also require prisoners with communicable diseases to be housed separately from other prisoners. *Defts' Ex.* 1, attached Ex. A, Section V, prisoner separation. According to defendants, a prisoner screening form containing observations of the booking officers and the responses of an inmate to various medical questions is completed during the booking process. *Defts' Ex.* 1 (an example of such form is attached to exhibit A). The screening form includes questions about whether the inmate has any communicable diseases. *Id.* The form has a place for the inmate's signature, the date and time, and the jailer's signature. *Id.*

Watkins asserts that while he was incarcerated at the MCJ he was never given a copy of, or even heard of, these rules. *Resp.* at ¶ 2 & ¶ 14. In fact, he states he has never seen or heard of these rules any time he has been arrested by the Malvern City Police Department. *Id.*

Similarly, Watkins asserts that neither during the arrest at issue in this case, or any of his other arrests, has he been given any medical forms or asked to sign or out any medical forms. *Id.* at ¶ 3 & ¶ 17. Watkins maintains these forms were either non-existent or used only for a few arrests. *Id.* at ¶ 3.

If in fact these forms were utilized, Watkins questions why the defendants have failed to produce a form signed by him. *Resp.* at ¶ 3. Watkins also denies he was verbally asked any of the questions contained on the written form including any questions about the medications he was on or communicable diseases. *Id.* at ¶¶ 4, 5, & 18.

When he was booked in on April 26, 1999, Watkins maintains that he told Paxton that he had taken his last medication for diabetes, blood pressure, seizures, and back spasms early that

morning and would be needing the medication and did not have any more at home. *Id.* at ¶ 21 & ¶ 23. At the time, Watkins was taking Dilantin for seizures, Glyburide for diabetes, Verapimil for hypertension, and Salsalate for lower back spasms. *Id.* at ¶ 22. These medications were prescribed by Dr. Bruce White and Dr. Vaughn. *Id.* He took most of these medications two or three times a day. *Id.*

After about three days without these medications, Watkins states he started to feel bad, was weak, and needed water because the water in the cell he was assigned to did not work. *Resp.* at ¶ 21. On April 29th, Watkins states that he also spoke with Paxton about needing the medication. *Id.* at ¶ 23. Watkins states he was told that Paxton and Mr. McGraw had passed the information on to Chief Taft, Lt. Ross, and Lt. McAnear. *Id.* On April 30, 1999, a notation was made in the jail log that Watkins had advised Officer McGraw that he needed his medication. *Id.*

All together, Watkins believes that he requested medical treatment at least sixteen or seventeen times. *Resp.* at ¶ 43. Watkins states that he made these requests to various jailers, Paxton, McGraw, Green, or whoever would come back and listen. *Id.* The requests were oral because, according to Watkins, the inmates were not given pencils or paper. *Id.* In response to his requests, Watkins states that he was told that his requests were passed on to Ross, McAnear and Taft. *Id.* Watkins maintains that his family also called Mayor Northcutt's office. *Id.*

With respect to Davis, Watkins states that he discussed his health with Davis on a few occasions. *Resp.* at ¶ 49. Watkins also asserts that he asked that his requests be passed on to Davis' supervisors. *Id.*

According to defendants, Officer McGraw contacted Dr. Vaughn regarding Watkins medical condition. *Defts' Ex.* 2 at ¶ 8. Dr. Vaughn is alleged to have stated that Watkins did not take his medication regularly and would take it only if the City of Malvern would pay for it. *Id.* Watkins maintains that if this occurred it is incorrect. *Resp.* at ¶ 26. He indicates he took his medication regularly except when he was drinking a lot. *Id.* Watkins states that he was not supposed to mix the medication and alcohol. *Id.*

After McGraw allegedly talked to Dr. Vaughn, Watkins did not receive his medication. *Resp.* at ¶ 33. In fact, he states he never received any medication or medical care while he was at the MCJ. *Id.* at ¶ 33 & ¶ 43. Watkins indicates he was told by Mrs. Margie, a jailer, that she had been told to give him water from their refrigerator and crackers at night. *Id.* at ¶ 33. Watkins asserts that he had started to get weaker due to his diabetes and seizures. *Id.* Watkins indicates his family did not have the money to provide him with the medication. *Id.* at ¶ 34. After he had been transferred to the county jail across the street, Watkins asserts that his Mother found some of his diabetes medication and brought it to the county jail. *Id.*

Because he did not get his prescription medications and was not taken to a doctor, Watkins indicates he had three or four slight seizures. *Resp.* at ¶ 44. After he was transferred to the Garland County Detention Center and seen by the jail doctor there, Watkins states that he was put on a second seizure medication, Carbamazepine. *Id.* Watkins asserts his health has declined because he did not get his medication while at the MCJ. *Id.*

William Ross was a sergeant with the Malvern Police Department in April and May of 1999. *Defts' Ex.* 3 at ¶ 4; *Resp.* at ¶ 35. Ross was on duty on April 30, 1999. *Defts' Ex.* 3 at ¶ 7; *Resp.* at ¶ 36. Ross asserts that he was unaware of any emergency situation that would

AO72A
(Rev. 8/82)

necessitate Watkins receiving emergency medical care. *Defts' Ex.* 3 at ¶ 7. Watkins, however, maintains that Ross was informed of Watkins' medical situation by Paxton. *Resp.* at ¶ 36.

In April and May of 1999, Georgia Green was employed as maintenance engineer for the City of Malvern. *Defts' Ex.* 4 at ¶ 4; *Resp.* at ¶ 37. Green asserts that she cleaned the cell Watkins and Steven Herron, an inmate who Watkins' contends had tested positive for HIV, occupied on a daily basis. *Defts' Ex.* 4 at ¶ 6.

In contrast, Watkins asserts that Green would sometimes bring a broom and mop to the cell and leave them for the inmates to use. *Resp.* at ¶ 38. Watkins maintains that this did not occur on a daily basis. *Id.* Watkins also states that other inmates were assigned to the cell he and Herron occupied. *Id.*

Green asserts that every time she was made aware of any unsanitary conditions she made immediate efforts to get the cell clean. *Defts. Ex.* 4 at ¶ 7. According to Watkins, there were a lot of times Herron would use the toilet and leave his feces in the non-working toilet including on the rim. *Resp.* at ¶ 39. Moreover, Watkins indicates Herron would put feces on the blanket and urinate on the floor. *Id.* Watkins points out they were required to eat in their cell. *Id.* Watkins states they were not Green's top priority when it came to sanitary conditions. *Id.* Additionally, he asserts Green stated that she could care less of they were clean or not. *Id.*

On at least one occasion, Green asserts that she was called to clean the cell because the toilet had overflowed. *Defts' Ex.* 4 at ¶ 8. Green indicates that while cleaning the cell, she found full rolls of toilet paper placed inside the toilet. *Id.*

Watkins denies this ever occurred. *Resp.* at ¶ 40. While the toilet overflowed on a lot of occasions, he maintains there was never a roll of toilet paper found in it. *Id.* He states the

-6-

hole in the toilet is too small for a roll to fit inside. *Id.* Further, if this occurred as Green asserts, Watkins questions why it was not noted in the jail logs. *Id.*

With respect to the jailers inquiring each day whether the inmates needed medical or dental care, Watkins asserts this was never carried out. *Resp.* at ¶ 18. Some mornings, he maintains that the jailers hardly came back to where the inmates were housed. *Id.* Watkins indicates that the inmates had to yell to get water brought back or to inform a jailer that someone was ill. *Id.* With respect to medication being dispensed, Watkins states that the radio dispatcher was the jailer. *Id.* at ¶ 19.

During part of the time Watkins was at the Malvern City Jail, Herron was also in the jail. *Resp.* at ¶ 6. When Herron was booked in, a medical screening form was completed and Herron gave no indication that he had any form of AIDS, the HIV virus, or any other communicable disease or had ever been diagnosed with such. *Id.* at ¶ 7; *Defts' Ex.* 2 at ¶ 13. Watkins, however, states that personnel at the Malvern City Police Department may have already known about Herron's condition because he had been arrested a number of times. *Resp.* at ¶ 7.

Watkins was housed with Herron for a period of time. *Resp.* at ¶ 8. Watkins believes it was ten or eleven days he was housed with Herron but it could have possibly been a little longer. *Id.* at ¶ 9.

Jerald McAnear has worked for the Malvern Police Department since January 12, 1993. *Resp.* at ¶ 10. McAnear has asserted by affidavit that he was in charge of the jail during the time relevant to this case. *Defts' Ex.* 2 at ¶ 4. Watkins maintains he is shocked by this fact. *Resp.* at ¶ 11. In his opinion, the MCJ was not a regular jail and he believes the radio dispatchers operated the MCJ. *Id.*

McAnear also asserts that during Watkins' incarceration at the MCJ, McAnear did not know that Herron had been diagnosed with the HIV virus. *Defts' Ex.* 2 at ¶ 12. Watkins disagrees asserting that McAnear and others at the Malvern Police Department knew Herron had the HIV virus. *Resp.* at ¶ 12.

In support, Watkins offers the notarized statement of Paxton dated November 25, 2005. *Plff's Ex.* A. At the time Paxton made the statement, he was a named defendant in this lawsuit. His statement concerns events occurring while he was employed by the Malvern Police Department under the supervision of Taft. On November 21, 2005, Watkins filed a motion to voluntarily dismiss Paxton. (Doc. 88). The motion was granted on December 1, 2005. (Doc. 89).

Paxton indicates he was employed as a jailer and did not hold any supervisory position at the Malvern Police Department. *Plff's Ex.* A. However, he asserts he did have frequent contact with the inmates and was regularly asked by inmates to talk to Lt. Ross or one of the other supervisors about inmate complaints. *Id.*

Paxton's statement in pertinent part provides as follows:

> Mr. Watkins was placed in a jail cell with an inmate (whom I will call Inmate X) whom the supervisors believed to be H.I.V. positive. Every time I had to transport Inmate X, I was verbally warned by the supervisors, including, but not limited to, Chief Taft, Lt. McAnear, and Lt. Ross, that Inmate X was H.I.V. positive and to be very careful around him. I was also warned to always wear rubber gloves when handling Inmate X. Inmate X also had mental problems and was admitted to the psych-ward at the Veterans Hospital in Little Rock shortly after Mr. Watkins was incarcerated with him. Inmate X had a habit of playing with his own feces and throwing it at others. I had also been warned by several supervisors that if Inmate X put his hand into the back of his pants to be careful because he may be preparing to throw defecation at me. It is my understanding that Inmate X died from complications caused by H.I.V.

AO72A
(Rev. 8/82)

> When I learned that Mr. Watkins had been placed in the same cell with Inmate X. I went to Lt. Ross, who was then the Patrol Sgt., and told him that having Mr. Watkins in that cell was placing his health at risk and giving him very good grounds for a lawsuit. Later I also spoke to Lt. McAnear and told him the same thing. I do not remember if it was Lt. Ross or McAnear, but one of them told me that Eddie Watkins was not smart enough to file and win a lawsuit against us. Neither one of them did anything to remove Mr. Watkins from the cell with Inmate X.
>
> Within 4 or 5 days of being in the same cell with Inmate X, Mr. Watkins somehow learned that Inmate X was H.I.V. positive and started demanding that one of them be moved. I took Mr. Watkins demand to Lt. Ross who told me that, "I could not be lucky enough for Eddie Watkins to catch AIDS." I was so stunned by his remark that I decided to talk to Chief Taft to see where he stood on the matter. Chief Taft told me that Eddie Watkins was a chronic complainer and that I should ignore Mr. Watkins and his complaints.
>
> During the time Mr. Watkins was in the cell with Inmate X, the toilet in their cell over flowed several times. The cause of the over flow is unknown to me, but the health risk to Mr. Watkins was in my opinion very real.
>
> During Mr. Watkins' incarceration he also complained of his need for some medicines. When I told Lt. Ross of this complaint, he said he would check into the matter. Later that day, Lt. Ross told me to tell Mr. Watkins that if he needed medicine he would have to call his family and have them bring the needed medicines to the jail for him. About a week and a half after Mr. Watkins' incarceration, I was finally sent to USA Drug to get his medications for him.
>
> It is my belief that Mr. Watkins' rights were violated by the Supervisor's of the City of Malvern and its Police Department and that their actions go beyond indifference. Their actions were, in my opinion, at least willful negligence, if not criminal.

*Plff's Ex.* A.

Watkins was aware that Herron was HIV positive. *Resp.* at ¶ 13(A). Watkins had known Herron for a number of years and heard about the diagnosis. *Id.* Watkins also heard it mentioned in Hot Spring County Circuit Court when both he and Herron had court appearances and Watkins heard Davis mention it. *Id.*

According to Watkins, Herron would pass blood during his bowel movement and it would get on the toilet seat. *Resp.* at ¶ 13(B). Watkins also indicates Herron had open sores on his "behind that blood would come from" and Herron played with his sores. *Id.* Watkins indicates Herron used the floor of the cell to urinate and for bowel movements and then would play with his feces and throw it at other inmates. *Id.* Watkins indicates only time and further testing will tell whether he contracted the virus from Herron. *Id.* Watkins states doctors have said it could take up to ten years before the virus could show up. *Id.*

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

AO72A
(Rev. 8/82)

## III. DISCUSSION

Defendants have now moved for summary judgment on both Watkins' claims. Defendants first contend they have been sued in their official capacity only. Defendants next contend no constitutional violation exists. Finally, defendants contend there is no basis on which the City of Malvern can be held liable.

### *Official and Individual Capacity Claims*

Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the United States. In order to state a claim under 42 U.S.C. § 1983, plaintiff must allege that the defendant acted under color of state law and that he violated a right secured by the Constitution. *West v. Atkins*, 487 U.S. 42, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988); *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir.1999).

Under § 1983, a defendant may be sued in either his individual capacity, or in his official capacity, or claims may be stated against a defendant in both his individual and his official capacities. In *Gorman v. Bartch*, 152 F.3d 907 (8th Cir. 1998), the Eighth Circuit discussed the distinction between individual and official capacity suits. As explained by the *Gorman* case:

> Claims against government actors in their individual capacities differ from those in their official capacities as to the type of conduct that is actionable and as to the type of defense that is available. *See Hafer v. Melo*, 502 U.S. 21, 112 S. Ct. 358, 116 L. Ed. 2d 301 (1991). Claims against individuals in their official capacities are equivalent to claims against the entity for which they work; they require proof that a policy or custom of the entity violated the plaintiff's rights, and the only type of immunity available is one belonging to the entity itself. *Id.* 502 U.S. at 24-27, 112 S. Ct. at 361-62 (1991). Personal capacity claims, on the other hand, are those which allege personal liability for individual actions by officials in the course of their duties; these claims do not require proof of any policy and qualified immunity may be raised as a defense. *Id.* 502 U.S. at 25-27, 112 S. Ct. at 362.

AO72A
(Rev. 8/82)

*Gorman*, 152 F.3d at 914.

The Eighth Circuit has consistently advised plaintiffs to specifically plead whether government agents are being sued in their official or individual capacities to ensure prompt notice of potential personal liability. *Nix v. Norman*, 879 F.2d 429, 431 (8th Cir. 1989). *See also Andrus v. Arkansas*, 197 F.3d 953 (8th Cir. 1999)(In actions against officers specific pleading of individual capacity is required to put public officials on notice they will be exposed to personal liability). When the plaintiff fails to state whether he is suing an official in his individual capacity, the Eighth Circuit has construed the claim to be against the official in his official capacity only. *See Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999)("[I]n order to sue a public official in his or her individual capacity, a plaintiff must expressly and unambiguously state so in the pleadings, otherwise, it will be assumed that the defendant is sued only in his or her official capacity."); *Egerdahl v. Hibbing Community College*, 72 F.3d 615, 620 (8th Cir. 1995)("*Nix* requires that a plaintiff's complaint contain a clear statement of her wish to sue defendants in their personal capacities. Neither a cryptic hint in a plaintiff's complaint nor a statement made in response to a motion to dismiss is sufficient.").

A review of the complaint in this case shows that plaintiff has failed to specifically plead whether the individually named defendants were being sued in their official or individual capacity. However, the court has an obligation to liberally construe a pro se complaint. *Haines v. Krener*, 404 U.S. 519, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972). *See also White v. Wyrick*, 530 F.2d 818, 819 (8th Cir. 1976)(finding pro se petition should be "interpreted liberally and . . . should be construed to encompass any allegation stating federal relief"). In so doing, we must keep in mind that the plaintiff is without legal expertise and he prepared his own pleading.

*Bracken v. Dormire*, 247 F.3d 699, 704 (8th Cir. 2001), *cert. denied*, ___ U.S. ___, 122 S. Ct. 302 (2001).

For this reason, we construe Watkins' complaint to be asserting both individual and official capacity claims. Additionally, we note that in responding to the summary judgment motion, Watkins has specifically stated that he intended to sue the defendants in both their official and individual capacities. *Resp.* at ¶ 41.

### *Denial of Medical Care*

As Watkins was a pretrial detainee, his denial of medical care claims are more properly analyzed under the due process clause of the Fourteenth Amendment than the Eighth Amendment. *Hartsfield v. Colburn*, 371 F.3d 454, 456-457 (8th Cir. 2004). "The standard to be applied in assessing a pretrial detainee's claim of due process violations . . . is not entirely clear." *Spencer v. Knapheide Truck Equipment Co.*, 183 F.3d 902, 906 (8th Cir. 1999)(citation omitted). Nevertheless, "[t]he Supreme Court has held that pretrial detainees are entitled under the Fourteenth Amendment to 'at least as great' protection as that afforded convicted prisoners under the Eighth Amendment." *Id.* (*quoting City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244, 103 S. Ct. 2979, 77 L. Ed. 2d 605 (1983).

In the absence of a clearly binding standard, the Eighth Circuit in analyzing inadequate medical care claims brought by pretrial detainees has applied the Eighth Amendment's deliberate indifference standard. *See e.g., Hartsfield*, 371 F.3d at 456-457; *Spencer,* 183 F.3d at 905-06; *Hall v. Dalton*, 34 F.3d 648, 650 (8th Cir. 1994)(analyzing a pretrial detainee's claim of inadequate medical care under the deliberate indifference standard). "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence

-13-

deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).

The deliberate indifference standard includes "both an objective and a subjective component: 'The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(*quoting Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)). Additionally, "'[t]he prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.'" *Jolly*, 205 F.3d at 1096 (*quoting Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir.1995)). *See also Gregoire v. Class*, 236 F.3d 413, 417 (8th Cir. 2000)("To establish a constitutional violation, it is not enough that a reasonable official should have known of the risk, a plaintiff must establish that the official in question did in fact know of the risk.").

"Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995, 1000, 117 L. Ed. 2d 156 (1992). "A medical need is serious if it is obvious to the layperson or supported by medical evidence." *Moore v. Jackson*, 123 F.3d 1082, 1086 (8th Cir. 1997) (per curiam) (internal quotation and citation omitted).

"[T]he failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge." *Long v. Nix*, 86

AO72A
(Rev. 8/82)

F.3d 761, 765 (8th Cir. 1996). In *Dulany v. Carnahan*, 132 F.3d 1234 (8th Cir. 1997), the Eighth Circuit said:

> As long as this threshold is not crossed, inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment. Deliberate indifference may be demonstrated by prison guards who intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment, or by prison doctors who fail to respond to prisoner's serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 103, 97 S. Ct. 285, 290, 50 L. Ed. 2d 251 (1976). Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation. *Id.* at 106, 97 S. Ct. at 292.

*Dulany*, 132 F.3d at 1239. *See also Tlamka v. Serrell*, 244 F.3d 628, 633 (8th Cir. 2001).

Here, Watkins contends that when he was booked in he indicated he was taking prescription medications for several medical conditions including diabetes, seizures, and high blood pressure. He maintains he received no medication, was not medically evaluated, and received no response to his requests for medication or treatment other than being told his requests were passed on to the supervisory officials at the MCJ. Because of the missed medication, Watkins asserts he suffered several seizures and became weak.

While defendants maintain Watkins' doctor was contacted, no affidavit or other materials from the doctor have been submitted and nothing has been submitted showing that Watkins was medically evaluated. Defendants have submitted information regarding the facility's rules on the provision of medical care, the distribution of medication, and how requests for medical care are handled. However, the exhibits submitted by the defendants suggest that at least some of these rules were not followed in Watkins' case. For instance, no prisoner screening form appears

AO72A
(Rev. 8/82)

to have been completed when Watkins was booked in. At the very least, one has not been submitted in support of the summary judgment motion.

Although it has been held that the occasional missed dose of medicine, without more, does not violate the Eighth Amendment, *see e.g., Zentmeyer v. Kendall County*, 220 F.3d 805, 812 (7th Cir. 2000); *Sires v. Berman*, 834 F.2d 9, 13 (1st Cir. 1987)(inmate with heart condition missed a morning dose of medication; no showing that this was an instance of callous disregard in the face of a pressing medical emergency); *Herndon v. Whitworth*, 924 F. Supp. 1171 (N.D. Ga. 1995)(occasional missed doses of medication do not implicate the Constitution), in this case Watkins was incarcerated at the MCJ from April 26, 1999, until May 9, 1999, during this time he did not receive a single dose of his prescribed medications. As noted above, while defendants maintain the decision was made not to provide the medication after consultation with Watkins' doctor, we believe genuine issues of material fact exist which preclude summary judgment in their favor. *See e.g., Munn v. Toney*, 433 F.3d 1087 (8th Cir. 2006)(missed-medication and missed-monitoring claims). Furthermore, we believe Watkins has raised genuine issues of material fact as to whether Taft, McAnear, and Ross were aware of the fact that Watkins was not getting his medication and failed to take corrective action. *See e.g., Meloy v. Bachmeier*, 302 F.3d 845, 849 (8th Cir. 2002)(supervisor is liable for Eighth Amendment violation only when he is personally involved in violation or when his corrective inaction constitutes deliberate indifference toward violation; supervisor must know about conduct and facilitate it, approve it, condone it, or turn blind eye to it).

AO72A
(Rev. 8/82)

With respect to Mayor Northcutt, we find that no basis of liability exists. Taft as chief of police controls the MCJ and oversees its operations. *See* Ark. Code Ann. § 12-41-401(a)("The city council shall have power to erect, establish, and maintain a city jail, which shall be in the keeping and under the control of the chief of police."). There is no indication in any of the materials submitted to the court that Northcutt has any oversight authority over the MCJ or takes any part in its day to day operations.

### *Exposure to an Inmate who tested Positive for HIV*

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S. Ct. 1708, 1719, 140 L. Ed. 2d 1043 (1998)(citation omitted). As noted above, Watkins was incarcerated at the MCJ as a result of pending criminal charges. Thus, his claims are "governed by the Fourteenth Amendment's Due Process Clause." *Whitnack v. Douglas County*, 16 F.3d 954, 957 (8th Cir. 1994)(*citing Davis v. Hall,* 992 F.2d 151, 152 (8th Cir. 1993) and *Bell v. Wolfish*, 441 U.S. 520, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979)).

Pretrial detainees are entitled to "adequate food, clothing, shelter, sanitation, medical care, and personal safety." *Alvarez-Machain v. United States*, 107 F.3d 696, 701 (9th Cir. 1996)(internal quotation and citation omitted). Although technically governed by the Fourteenth Amendment, the Eighth Circuit has said that "the standards applied to Eighth Amendment and Fourteenth Amendment claims have been the same" in this circuit. *Hall v. Dalton*, 34 F.3d 648, 650 (8th Cir. 1994). *See also Crow v. Montgomery*, 403 F.3d 598, 601 (8th Cir. 2005)(In cases

involving pretrial detainees, "we apply the identical deliberate-indifference standard as that applied to conditions-of-confinement claims made by convicts." (internal quotations and citations omitted)).

In *Helling v. McKinney*, 509 U.S. 25, 113 S. Ct. 2475, 125 L. Ed. 2d 22 (1993), the Supreme Court held that the Eighth Amendment protected against not only immediate present harm but also against future harm. *Id.*, 113 S. Ct. at 2480. It held an Eighth Amendment claim could be stated where an inmate alleged that prison officials had, with deliberate indifference, exposed him to a serious, communicable disease that posed "an unreasonable risk of serious damage to [the prisoner's] future health." *Id.*, 113 S. Ct. at 2480.

The *Helling* case involved a claim of exposure to environmental tobacco smoke (ETS). The Court said McKinney should be provided with an opportunity to prove his allegations which would "require him to prove both the subjective and objective elements necessary to prove an Eighth Amendment violation." *Helling*, 113 S. Ct. at 2482. With respect to the objective factor, the Court noted "McKinney must show that he himself is being exposed to unreasonably high levels of ETS." *Id.* The Court stated that more was required:

> than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to ETS. It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate.

AO72A
(Rev. 8/82)

*Id.* With respect to the subjective component, deliberate indifference, it was noted that consideration could be given to the realities of prison administration and the policies of the prison facility. *Id.*

We believe Watkins has sufficiently alleged the existence of a pervasive or unreasonable risk of contracting HIV from Herron. Watkins and Paxton have both asserted that the inmates at the MCJ and defendants were aware that Herron was HIV positive. Only one of the affidavits submitted, that of McAnear, contains a specific assertion that he "was not made aware that Steven Herron had been diagnosed with the HIV virus." *Defts' Ex.* 2 at ¶ 12.

Further, although Taft, McAnear, Ross, and Green make the general statement that they were unaware of any unconstitutional conditions that ever existed at the jail, they do not dispute Watkins' assertions that Herron urinated and defecated on the floor, had open bleeding sores on his buttocks that he played with, threw feces at inmates and jailers, and had mental problems. *Defts' Ex.* 1 at ¶ 4, 2 at ¶ 6, 3 at ¶ 6, & 4 at ¶ 5. Defendants do not deny that Watkins asked to be moved to a different cell because Herron was HIV positive. Defendants do not suggest they took any action in response to the request. *See e.g., Nei v. Dooley*, 372 F.3d 1003, 1007 (8th Cir. 2004)(Evidence from which jury could find that officials knew AIDS infected inmate fought with other inmates, the fights involved fluid exchange, and threats of infection, or both, and that the officials did not respond to the threat of harm in an objectively reasonable way); *Massick v. North Central Correctional Facility*, 136 F.3d 580, 581 (8th Cir. 1998)(Officials entitled to qualified immunity where exposure was brief and they promptly separated the inmates as soon as Massick specifically complained about being placed with someone who was HIV-positive). At a minimum, given the separation policy of the MCJ, it would appear that an investigation

-19-

AO72A
(Rev. 8/82)

should have occurred in response to Watkins' request to be moved. Nothing before the court suggests Watkins' request was investigated or considered.

With respect to Mayor Northcutt, however, we do not believe there is any basis he can be held liable with respect to this claim. Watkins does not allege he Northcutt was personally involved in, or even aware, of Watkins' cell assignment, his request to be moved to a different cell, or his assertions that his cellmate was HIV positive.

## IV. CONCLUSION

I therefore recommend that the defendants' motion for summary judgment be granted in part and denied in part. Specifically, I recommend that the motion be granted as to Mayor Northcutt. In all other respects, I recommend that the motion for summary judgment be denied.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 24th day of March 2006.

/s/ Bobby E. Shepherd
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)